**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO.  22-cr-30136-DWD |
| | ) | |
| LEDANIEL RUSSELL, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Now comes, The United States of America, by Rachelle Aud Crowe, United States Attorney for the Southern District of Illinois, and through Daniel S. Carraway, Assistant United States Attorney, who provides the Court with the Government's Sentencing Memorandum.

## I.   INTRODUCTION:

Ledaniel Russell ("Defendant") transported nearly forty kilograms of deadly heroin, cocaine, fentanyl, and methamphetamine across the country. Utilizing his legitimate occupation as an over-the-road truck driver, the Defendant sought to earn extra money by hauling rugs in addition to his legitimate load. Had he not been stopped by Illinois State Police troopers, he would have been successful in delivering the drugs to communities across Michigan, destroying the lives and communities of thousands.  While his role in the distribution of illegal drugs appears to be that of a courier, his role was no less crucial. The sheer volume and variety of drugs he transported were staggering. In considering the sentencing factors and the Defendant's criminal history the United States respectfully recommends a sentence at the high end of the Guidelines range.

## II.   OFFENSE CONDUCT:

On September 15, 2022, the Defendant used his legitimate employment to transport nearly

forty kilograms of 4 different kinds of deadly drugs across the country. A trooper with the Illinois State Police Department stopped a semitruck driven by the Defendant and immediately upon approaching the vehicle and encountering the Defendant, the trooper noticed an odor or marijuana coming from the cab of the truck. During the stop, the trooper noticed the Defendant to be unusually nervous—a observation that increased once law enforcement started a probable cause search of the cab of the truck. That is because what was in the trailer of the truck was not the only thing the Defendant was hauling that day. Law enforcement officers located two large black duffel bags, that once opened revealed the following: a kilogram of heroin, nearly 2 kilograms of cocaine, 4.5 kilograms of fentanyl, and almost 32 kilograms (or 70 pounds) of 99% pure methamphetamine.

 



During a *Mirandized* interview of the Defendant, he admitted that he picked up the drugs in Oklahoma City, OK the day prior and intended to deliver them to another individual in Michigan after he stopped in Indiana to deliver his legitimate load he was hauling in the semitrailer. In exchange for delivering the drugs to Michigan the Defendant was set to receive $10,000 to $15,000 for his role.

### III.    APPLICATION OF 18 U.S.C. § 3553 SENTENCING FACTORS:

1. **The nature and circumstances of the offense and the history and characteristics of the defendant:**

The Defendant is no stranger to law enforcement and the criminal justice system. In the early nineties, at the young age of 19 and 21, the Defendant was convicted of 2 separate armed robberies. In March 1993 the Defendant, armed with a sawed-off shotgun, robbed three victims of their personal property in San Bernardino, California. Despite being on probation for Unlawful Taking of a Vehicle at the time of the robbery, the Defendant was given a relatively light sentence of 2 years. He was paroled in May 1994, but squandered the opportunity he was given. Not only was Defendant unsuccessful on parole, but his failure was not for administrative or minor violations. In February 1995, this time armed with a pistol, the Defendant robbed another woman of her personal belongings in California. He was sentenced to 7 years (later reduced to 6 years) and later paroled in March 2000. He was returned to custody for a violation and later discharged from parole in September 2001.

Less than 2 months later in November 2001, the Defendant was again arrested and convicted—this time for Possession of Methamphetamine. While the Defendant was charged with, and ultimately convicted of, *possession* of methamphetamine, it is concerning that he denied ever using the substance to probation in the instant case. Doc. 36, ¶ 61. This would lead to two logical conclusions—the Defendant lied to probation, or the Defendant was dealing methamphetamine all

the way back in 2001. Yet again, the Defendant was given another break by the Courts in California and placed on probation for 36 months after a short jail sentence. During this period again the Defendant violated the terms of his probation, this time by possessing marijuana *in a penal institution* in May 2003. After a 4-year term of imprisonment for that offense, the Defendant was paroled in June 2006—only to be returned for violations in May 2007, March 2008, and September 2009. The final violation was the commission of a new felony offense (Counterfeit Seal) in Rancho Cucamonga, California. The Defendant was again paroled in 2012 but returned to custody in 2018 for a conviction for Domestic Battery in Las Vegas, Nevada.

Despite the Defendant's criminal history, involvement with the Court system, and previous lenient sentences he has received for serious crimes, he continued to engage in criminal activity, this time at a much grander scale. The nature and circumstances of the offense for which the Defendant now stands convicted are troubling. Not only did the Defendant use his legitimate employment to traffic drugs across the country, but the sheer volume and variety of the drugs is staggering. This distribution of controlled substances also appears to be for one reason—money. The Defendant denied any drug use or addiction in the PSR. *Id*. He was not couriering these drugs for a portion of the drugs, or to feed a habit. He was simply trying to line his pockets with at least an extra $10,000-$15,000. The Defendant sought to add that payment to his otherwise well-paying job as a truck driver. The Defendant reported making approximately $86,400 – $115,200 annually, highlighting the sheer greed of the Defendant. Doc. 36, ¶ 66. Put simply, the Defendant wanted to line his pockets with extra money while ignoring the devastating effects those drugs would have on the receiving communities. It is for those reasons that the United States believes a sentence at the high end of the Guidelines is appropriate.

4

2. **The need for the sentence imposed to accomplish each of the purposes of sentencing:**

    a. **To reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant:**

There is no doubt the offense the Defendant committed is a serious crime, regardless of whether his role in the distribution of illegal drugs was as the original source of supply, the courier delivering the drugs from one city to the other, or a street level dealer taking advantage of addicted buyers whose lives have been destroyed by drugs. The Defendant was responsible for transporting approximately forty kilograms of various drugs, including deadly methamphetamine, heroin, and fentanyl–enough to endanger the lives and destroy the communities of tens of thousands of eventual customers.

Methamphetamine remains a dangerous drug that is ravishing communities across the country. *See* P. Todd Korthuis, MD, MPH, et al. *Association of Methamphetamine and Opioid Use with Nonfatal Overdose in Rural Communities,* in the Journal of the American Medical Association Open Network (2022). Methamphetamine is commonly paired with opiates and other illegal substances, leading to devastating, sometimes fatal, results. *Id*. However, even when not paired with an opiate or other drug, methamphetamine still destroys individual's lives. Continued methamphetamine use causes changes in the brain's dopamine system, often permanently. *See Volkow ND, Chang L, Wang GJ, et al. Association of dopamine transporter reduction with psychomotor impairment in methamphetamine abusers. Am J Psychiatry. 2001; Wang G-J, Volkow ND, Chang L, et al. Partial recovery of brain metabolism in methamphetamine abusers after protracted abstinence. Am J Psychiatry. 2004* This change affects areas of the brain involved with emotion and memory, and normally leads to cognitive problems for long-term users. The amount of methamphetamine alone trafficked by the Defendant was enough to create these long-

term effects of thousands, if not tens of thousands of individuals.

But methamphetamine was not the only deadly drug trafficked by the Defendant. The distribution of heroin, cocaine, and fentanyl posed even more deadly potential for addicts across the country. It is not secret that the ready availability of fentanyl on the streets of big and small cities alike across the United States is leading to devastating and fatal outcomes. From only January 2020 to January 2023 the rise in monthly fentanyl overdose deaths has risen by more than 100% in the United States, often resulting in an annual overdose death rate of 60,000 people from fentanyl alone. The four drugs trafficked by the Defendant were significant contributors to the rise in deadly overdoses across the country. A look at a 12-month rolling analysis of fatal drug overdoses in the Country shows the alarming numbers:



Ahmad FB, Cisewski JA, Rossen LM, Sutton P. *Provisional drug overdose death counts*. National Center for Health Statistics. (As of December 3, 2023)

A look at the preceding 12-month rolling figure for January 2023, and including *only* the drug types that were trafficked by the Defendant, show drug overdose rates by drug class of 5,709 overdose deaths from heroin; 28,331 overdose deaths from cocaine; 35,281 overdose deaths from

methamphetamine; and 75,549 overdose deaths from fentanyl. *Id.* These 4 drugs alone were responsible for the death of 144,870 individuals in the United States from February 2022 to January 2023. Had the drugs the Defendant intended to deliver in Michigan not been seized, that number would have only increased and more people would have died.

Courts must send a strong message that drug laws need to be respected, and individuals that violate those laws suffer significant consequences. The Defendant's actions were dangerous and a high-end sentence for this Defendant is appropriate to protect the public from future crimes of the Defendant and to provide deterrence to this individual Defendant. A high-end Guidelines sentence also sends a clear and firm message to the community at large, that dealing in these devastating and dangerous controlled substances will not be tolerated.

    b. **To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner:**

The Defendant reported that he graduated from high school; however, the PSR notes that school records disclosed the Defendant completed his junior year and was deemed to be a "non-graduate." Further attempts by probation to verify the Defendant's completion of a General Education Diploma (GED) program were unsuccessful. Incarceration in the Bureau of Prisons will afford him an opportunity to take classes, continue his education, and obtain a GED.

**3.  <u>The kinds of sentences available to the Court:</u>**

The PSR correctly lists the sentences available to the Court, including a statutorily mandated minimum 10 years of imprisonment up to life, a minimum of five years of supervised release, and the ineligibility of a sentence of probation. Additionally, the PSR correctly calculated the maximum fine of $10,000,000.

4. **<u>The kinds of sentences and sentencing range established by the Guidelines and any pertinent policy statement:</u>**

The PSR correctly determined that Defendant has amassed seven (7) criminal history points and has a Criminal History Category of IV. The PSR calculates a total offense level of 25 and a corresponding effective guideline range of 120 months imprisonment, not less than 5 years of supervised release, and a fine of $20,000-$10,000,000. For the reasons set forth in the Government's PSR objection (Doc. 37) the United States submits that the total offense level should be 29 with a corresponding guideline range of 121-151 months imprisonment, not less than 5 years of supervised release, and a fine of $30,000-$10,000,000.

5. **<u>The need to avoid any unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct:</u>**

The Defendant should be compared to others throughout the country who have committed this same type of crime. Imposing a Guideline sentence is the best way to avoid disparities across the entire federal system. As the Seventh Circuit has said, "we have repeatedly held that a within-guidelines sentence necessarily takes into account unwarranted disparities." See, e.g., *United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir. 2012). This is because "the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006). Indeed, the Court has noted that imposing a within-guidelines sentence is the surest way to avoid unwarranted disparities. *United States v. Babul*, 476 F.3d 498, 501–02 (7th Cir. 2007); *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013). A sentence within the Guidelines for the Defendant would eliminate any unwarranted sentencing disparity compared to other similarly situated defendants.

6. **<u>The need to provide restitution to any victims of the offense:</u>**

Restitution is not an issue in this case.

8

## IV.     <u>CONCLUSION</u>

The United States respectfully requests a high-end Guidelines sentence.

Respectfully submitted,

**UNITED STATES OF AMERICA**,

RACHELLE AUD CROWE
United States Attorney

*s/ Daniel S. Carraway*
DANIEL S. CARRAWAY
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, Illinois 62208
(618) 628-3700 telephone
(618) 628-3720 facsimile
E-mail: Daniel.Carraway@usdoj.gov

9